TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-11-00834-CR






Travis Campbell, Appellant


v.


The State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 403RD JUDICIAL DISTRICT

NO. D-1-DC-11-904083, HONORABLE BRENDA KENNEDY, JUDGE PRESIDING





O P I N I O N

 A jury convicted appellant Travis Campbell of aggravated assault with a deadly
weapon. See Tex. Penal Code Ann. § 22.02 (West 2011). Pursuant to an agreement with the
State regarding punishment, the trial court sentenced Campbell to four years' imprisonment. In
his sole issue on appeal, Campbell argues that the trial court erred by improperly admitting
Facebook messages that the State contended were created by Campbell. We affirm the judgment of
the trial court.


BACKGROUND

 At the time of the incident giving rise to Campbell's arrest, Campbell was sharing a
house with his girlfriend, Ana B., and her two young children. (1) On February 26, 2011, the night
before the incident, the couple had gone out for dinner and drinks at a local restaurant. At trial, Ana
and Campbell presented wholly different accounts of the events following that outing. According to Ana, Campbell became upset during dinner when Ana received a
Facebook message on her phone from one of Campbell's male friends. Following dinner, the couple
returned home, and Campbell continued to question Ana about the message. Eventually, Campbell
left to go to a party while Ana remained at the house. Ana testified that when Campbell returned,
at approximately four in the morning, he woke her and began questioning her again about the
Facebook message.

 In response to Campbell's questioning, Ana told Campbell to leave and tried to push
him off the bed with her feet. According to Ana, Campbell then took off his clothes and approached
Ana suggesting he wanted to have sex with her. When Ana resisted, Campbell hit her several times
in her face and chest with her cell phone. Ana testified that Campbell then left the room and came
back with a two-pronged fork and a knife. Holding the fork to Ana's side, Campbell told Ana to text
a profane message to the male friend who had sent Ana the earlier message. Campbell hit Ana in
the face with the handle of the fork when she refused. Ana recalled at trial that Campbell also held
a knife to her neck and threatened to kill her if she did not "lick his ass." Ana testified that when she
refused, Campbell forced her to have vaginal, anal, and oral sex with him. Afterwards, according
to Ana, Campbell threatened Ana's life and hit her repeatedly until she blacked out. When she
awoke, Ana grabbed some clothes, kicked a screen off her bedroom window, and jumped out. Ana
then ran to her neighbor's house, who upon her request drove her to her aunt's house a few miles
away. Shortly thereafter, Deputy Rick Lane with the Travis County Sheriff's Office arrived at Ana's
aunt's house, and Ana reported to Lane that she had been sexually assaulted by Campbell.

 The next day, Ana went to Saint David's Hospital so that a sexual assault examination
could be performed. Julie Gibbs, the sexual assault nurse examiner, testified that Ana had "quite a
large amount of injuries, majority to her face, [and] multiple lacerations." Gibbs testified that Ana
had lacerations on her nose and the side of her face, redness to her breast, bruising on her neck and
left arm, broken capillaries in the back of her throat, and redness to the vaginal area. Gibbs also
stated that the bruise on Ana's arm had three little scabs in the center and that Ana had told her "this
was from a kitchen two-prong fork."

 At trial, Campbell took the stand in his own defense and told a very different story.
Campbell acknowledged that he and Ana were arguing when they went out for dinner. However,
Campbell testified that the argument had begun the night before, when Ana had left her children with
him but did not return when she said she would. According to Campbell, Ana was angry with him
during dinner because he had threatened to end their relationship over the matter.

 According to Campbell, he and Ana went home after dinner and had consensual sex.
Campbell denied that he ever forced Ana to have sex. Campbell testified that when he returned
home from the party, Ana was intoxicated and mad at him for threatening to end their relationship.
Campbell stated that Ana then retrieved the meat fork from the kitchen, held it up to him, and began
to hit him in the face. Campbell admitted striking Ana, but explained that he did so only after she
had repeatedly hit him. Campbell testified that he then left the house and Ana followed him, falling
and injuring herself on the exterior stairs, as he drove away.

 At the conclusion of trial, the jury found Campbell "not guilty" of all three counts of
aggravated sexual assault as alleged in the indictment. See Tex. Penal Code Ann. § 22.021 (West
2011). However, the jury found Campbell guilty of one count of aggravated assault with a deadly
weapon, a fork. (2) See id. § 22.02. In accordance with the State's agreement with Campbell, the court
imposed a sentence of incarceration for four years. This appeal followed.

 In his sole issue on appeal, Campbell complains that the trial court erred in admitting
evidence that was not properly authenticated and was harmful to his defense. Specifically, Campbell
contends that the trial court erred in admitting a printout of Facebook messages purportedly
sent by Campbell to Ana and identified at trial as State's Exhibit 14. Campbell argues that the only
authentication evidence presented prior to the admission of the exhibit was Ana's testimony that
she received these Facebook messages from Campbell a few days after the alleged assault, that
she did not send them to herself, and that she did not have access to Campbell's Facebook account
after the incident. Campbell asserts that there is no evidence that the messages are in fact from his
Facebook account. Campbell contends that the trial court's admission of these messages was harmful
error because the exhibit was "a crucial piece of evidence establishing the aggravated assault with
the fork."

 The State counters that the trial court did not err in admitting the Facebook messages
because the State presented sufficient evidence to support a finding that the messages were sent by
Campbell. Alternatively, the State contends that if there was any error in admitting the messages,
it was harmless.

APPLICABLE LAW AND STANDARD OF REVIEW


 Under rule 104(a) of the Texas Rules of Evidence, whether or not to admit evidence
at trial is a preliminary question to be decided by the court. Tex. R. Evid. 401(a); Tienda v. State,
358 S.W.3d 633, 638 (Tex. Crim. App. 2012). Only relevant evidence is admissible. Tex. R. Evid.
401, 402. The issue of authentication--that the proffered evidence is what the proponent claims it
to be--arises when "the relevancy of any evidence depends upon its identity, source, or connection
with a particular person, place, thing, or event." Shea v. State, 167 S.W.3d 98, 104 (Tex. App.--Waco
2005, pet. ref'd). Evidence has no relevance if it is not authentically what the proponent claims it
to be. Tienda, 358 S.W.3d at 638. The requirement of authentication or identification is a condition precedent to
admissibility and is satisfied by evidence sufficient to support a finding that the matter in question
is what the proponent claims it is. Tex. R. Evid. 901(a). Whether the proponent of evidence has
satisfied the threshold requirement of authenticity is one of the preliminary questions to be decided
by the court. Tienda, 358 S.W.3d at 638. However, rule 901 "does not erect a particularly high
hurdle, and that hurdle may be cleared by circumstantial evidence." Peter T. Hoffman, Texas Rules
of Evidence Handbook, Article IX at 948 (8th ed. 2008-09) (quoting United States v. Chin, 371 F.3d
31, 37 (2d Cir. 2004)). The proponent of evidence does not need to "rule out all possibilities
inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports
to be." Id. In fact, in performing its gate-keeping function under rule 104, the trial court itself need
not be persuaded that the proffered evidence is authentic. Tienda, 358 S.W.3d at 638. Rather, the
ultimate question of whether an item of evidence is what the proponent claims is a question for the
fact finder. Id. In a jury trial, the preliminary question for the trial court to decide is simply whether
the proponent of the proffered evidence has supplied facts that are sufficient to support a reasonable
jury determination that the evidence is authentic. Id.; see also Manuel v. State, 357 S.W.3d 66, 74
(Tex. App.--Tyler 2011, pet. ref'd) ("The proponent must only produce sufficient evidence that a
reasonable fact finder could properly find genuineness.").

 An appellate court reviews a trial court's decision as to whether evidence is properly
authenticated for an abuse of discretion. Tienda, 358 S.W.3d at 638. A trial court does not abuse
its discretion when it reasonably believes that a reasonable juror could find that the evidence has
been authenticated. Druery v. State, 225 S.W.3d 491, 502 (Tex. Crim. App. 2007). If the trial court's
ruling is at least "within the zone of reasonable disagreement," we will not interfere. Id.

DISCUSSION

 Rule 901 of the Texas Rules of Evidence provides a nonexclusive list of methods for
authentication of evidence. See Tex. R. Evid. 901. For example, evidence may be authenticated by
testimony from a witness with knowledge that a matter is what it is claimed to be. Id. R. 901(b)(1).
Evidence may also be authenticated by "appearance, contents, substance, internal patterns, or
other distinctive characteristics, taken in conjunction with circumstances." Id. R. 901(b)(4). In the
context of communications, the authentication issue that generally arises is whether the evidence is
sufficiently linked to the purported author. With respect to electronic communications--such as
e-mails, text messages, and as in this case, Facebook--the rules of evidence, including rule 901, are
considered at least generally "adequate to the task." See Tienda, 358 S.W.3d at 638. Printouts of
emails, internet chat room dialogues, and text messages have all been admitted into evidence when
found to be sufficiently linked to the purported author so as to justify the submission to the jury for
its ultimate determination. See id. at 639.

 However, in evaluating whether an electronic communication has been sufficiently
linked to the purported author, we recognize that electronic communications are susceptible
to fabrication and manipulation. See id. at 641 (explaining that some courts, "mindful that the
provenance of such electronic writings can sometimes be open to question," have held that prima
facie authenticity was not demonstrated). For example, social networking websites, such as Facebook
and MySpace, allow users to establish an online account, create a profile, and then invite others
to access that profile as a "friend." See Doe v. MySpace, Inc., 474 F. Supp. 2d 843, 845-46 (W.D.
Tex. 2007); see also Griffin v. State, 19 A.3d 415, 420-21 n.6 (Md. 2011) (noting that MySpace
and Facebook work in same way). Accordingly, with respect to identity, Facebook presents an
authentication concern that is twofold. First, because anyone can establish a fictitious profile under
any name, the person viewing the profile has no way of knowing whether the profile is legitimate.
Griffin, 19 A.3d at 421 (citing David Hector Montes, Living Our Lives Online: The Privacy
Implications of Online Social Networking, J.L. & Pol'y for the Info. Soc'y, Spring 2009, at 507, 508).
Second, because a person may gain access to another person's account by obtaining the user's name
and password, the person viewing communications on or from an account profile cannot be certain
that the author is in fact the profile owner. Id. Thus, the fact that an electronic communication on
its face purports to originate from a certain person's social networking account is generally
insufficient standing alone to authenticate that person as the author of the communication. See
Tienda, 358 S.W.3d at 642. However, the most appropriate method for authenticating electronic
evidence, as with any kind of evidence, "will often depend on the nature of the evidence and the
circumstance of the particular case." Id. at 641.

 The Texas Court of Criminal Appeals recently addressed the authentication of printouts
of social-networking websites in Tienda, 358 S.W.3d at 638-47. In that case, the State offered
evidence associated with three MySpace personal profiles, including account information and
printouts of profile pages on which photographs, comments, and music were posted. Id. at 642. At
trial, the defendant did not admit that he had authored the pages. Id. at 647. Further, the State did
not attempt to authenticate the pages through the results of an examination of the defendant's internet
history or hard drive, nor did the State attempt to link the pages to the defendant through an
employee of the social-networking website. Id. Upon the State's offering, defense counsel objected
to the admission of the evidence, emphasizing that the case-specific facts referenced in the MySpace
messages associated with the account "were not facts solely within the defendant's knowledge, but
were known to the deceased's family, friends, and practically any third party interested in the case."
Id. at 636. Nevertheless, the trial court admitted the evidence over defendant's objection. Id. at 635.

 On appeal, the court of criminal appeals held that there was "ample circumstantial
evidence--taken as a whole with all the individual particular details considered in combination--to
support a finding that the MySpace pages belonged to the appellant and that he created and
maintained them." Id. at 645. For example, the court of criminal appeals noted that there were
numerous photographs of defendant with his unique arm, body, and neck tattoos, as well as his
distinctive eyeglasses and earring. There was also a reference to the victim's death and music from
his funeral, as well as references to the defendant's gang and messages referring to the shooting. Id.
While the court acknowledged that it was "conceivable" that someone else had fabricated and
maintained the MySpace pages, the court explained that this was a "scenario whose likelihood and
weight the jury was entitled to assess." Id. at 646.

 In this case, the State introduced one exhibit comprised of printouts of three Facebook
messages alleged to have been sent by Campbell to Ana's Facebook account. Each message contain
a banner and date stamp at the top of the message stating, "Travis Campbell, March 2 [time]." The
first message states:

 

 what was i thinking I am totally wrong it don't matter what you say or do to me i
should never put my hand on you, who is me to do that to you you give me nothing
but love on your kids, then now i disregard that i am so sorry you or [sic] the only
person i got on my side please help me ana please i would love to call u don't lock
me up please i am begging you


Similarly, a second message, dated that same day, states:


 i did you bad something that you would never thaugh [sic] i am very sorry i am mad
of my self, I am begging your fotgivness [sic] please i can't sleep or eat i f-- up the
bess [sic] thing i ever have, i am sorry ana help me please i am week [sic] i don't
know what to do i am going to call u please answer please don't sign the paper please
ana, I need to talk to u.


Finally, a final message, also dated March 2, states:

 please help me ana i cry every day i am so f--ing stuppid [sic] for hurthig [sic] u i
am guilty what was I thinking please message me tell me your mind let me talk
please, I am so ashame [sic].



 At trial, the State attempted to impeach Campbell with the Facebook messages.
In response, Campbell acknowledged having a Facebook account but denied sending Ana any
Facebook messages after the incident. Campbell claimed that both he and Ana, but no one else,
had his Facebook account password. In order to authenticate the messages, the State recalled Ana
to testify about the origin of the messages. Ana testified that she recognized the printouts as messages
she had received from Campbell on March 2, 2011. She also testified that she did not send them to
herself. While Ana admitted that she had access to Campbell's Facebook account at sometime
before March 2, she stated that both she and Campbell had changed their passwords before this date.
Upon Ana's testimony, and over Campbell's objection as to authenticity, the trial court admitted the
messages as a single exhibit.

 In analyzing whether the evidence is sufficient to support the trial court's ruling, we
start by noting that the content of the messages themselves purport to be messages sent from
a Facebook account bearing Campbell's name to an account bearing Ana's name. While this fact
alone is insufficient to authenticate Campbell as the author, when combined with other circumstantial
evidence, the record may support a finding by a rational jury that the messages were authored and
sent by Campbell. See id. at 642; see also Commonwealth v. Purdy, 945 N.E.2d 372, 381 (Mass.
2011) (explaining that e-mail sent from Facebook account bearing defendant's name not sufficiently
authenticated without additional "confirming circumstances"). Accordingly, we examine whether
the remaining evidence supports the trial court's ruling.

 Turning to the Facebook messages themselves, we find that the messages contain
internal characteristics that tend to connect Campbell as the author. First, the unique speech pattern
presented in the messages is consistent with the speech pattern that Campbell, a native of Jamaica,
used in testifying at trial. (3) Second, the messages reference the incident and potential charges, which
at the time the messages were sent, few people would have known about. See Massimo v. State, 144
S.W.3d 210, 216 (Tex. App.--Fort Worth 2004, no pet.) (concluding that "internal characteristics"
served to authenticate e-mails, including fact that e-mail was sent shortly after altercation and
referenced altercation and fact that contents of e-mails were written in same way in which appellant
communicated). Thus, the contents of the messages provide circumstantial evidence supporting the
trial court's ruling.

 Further, the undisputed testimony provides circumstantial evidence tending to
connect Campbell to the messages. The undisputed testimony yields the following: (1) Campbell
had a Facebook account; (2) only he and Ana ever had access to his Facebook account; and (3) Ana
received the messages bearing Campbell's name. This evidence suggests that only Campbell or Ana
could have authored the messages received in Ana's Facebook account. In addition, Ana told the
jury that she could not access Campbell's account, and therefore, she did not send the messages to
herself. While this evidence certainly does not conclusively establish that Campbell authored the
messages--in fact, Campbell insisted that he did not--the State was not required to "'rule out all
possibilities inconsistent with authenticity or prove beyond any doubt that the evidence is what it
purports to be.'" See Manuel, 357 S.W.3d at 74 (quoting Chin, 371 F.3d at 37). So long as the
authenticity of the proffered evidence was at least "within the zone of reasonable disagreement,"
the jury was entitled to weigh the credibility of these witnesses and decide who was telling the truth.
See Tienda, 358 S.W.3d at 638, 645-46 (explaining that conceivably someone could have concocted
appellant's MySpace page "[b]ut that is an alternate scenario whose likelihood and weight the jury
was entitled to assess once the State had produced a prima facie showing that it was appellant, and
not some unidentified conspirators or fraud artists, who created and maintained these MySpace pages").

 The facts and issues in this case are similar to those in a case decided by our sister
court of appeals in Fort Worth. See Massimo, 144 S.W.3d at 216-17. In that case, the defendant
disputed the authenticity of a harassing e-mail that the State alleged she had sent to the complainant.
See id. at 216-17. At trial, the defendant asserted that someone was impersonating her and sent the
e-mail on her behalf. Id. However, the court of appeals concluded that the trial did not abuse its
discretion in admitting the e-mail, explaining that the e-mail contained characteristic evidence
supporting the assertion that appellant had sent it. Id. at 216. For example, the court pointed out that
(1) the e-mail was sent shortly after a physical altercation between the defendant and complainant,
and the e-mail referenced the altercation; (2) the complainant recognized the e-mail account as the
defendant's and had previously received messages from the account; (3) only a few people knew
about the things discussed in the e-mail; (4) the complainant testified that the way in which the
e-mail was written was the way in which the defendant would communicate; and (5) another witness
testified that she had seen the defendant send similar harassing e-mails from a different account. Id.
While this case involves Facebook messages, as opposed to e-mails, the messages in this case
likewise include similar identifying features.

 From the record before us--including (1) the similarities between the speech pattern
presented in the messages and Campbell's speech pattern at trial; (2) the fact that the messages
reference the incident and were sent just a few days after the incident; (3) testimony establishing
that only Campbell and Ana have ever had access to Campbell's Facebook account; and (4)
Ana's testimony that she did not have access to Campbell's Facebook account at the time the
messages were sent--we conclude that there was prima facie evidence such that a reasonable jury
could have found that the Facebook messages were created by Campbell. Accordingly, we cannot
conclude that the trial court abused its discretion in admitting the evidence over Campbell's
objection to authentication.

 In addition, even if the trial court had abused its discretion in admitting the Facebook
messages as evidence, we would find that the error was harmless. Campbell argues that the admission
of the messages was harmful because Campbell and Ana had very different uncorroborated stories
concerning the events leading to Ana's injuries, and the Facebook messages contain an admission
that Campbell "put [his] hands on" Ana. Campbell contends that this alleged admission was "crucial"
to the jury's finding that Campbell had committed aggravated assault.

 The State contends that any error in admitting the Facebook messages was harmless
because the State's case against Campbell, even aside from the messages, was substantial. The State
argues that while Campbell and Ana's stories differ drastically, the State presented extensive
evidence corroborating Ana's account. First, Ana's neighbor and cousin testified that Ana appeared
to be in a state of shock shortly after the incident. Next, Gibbs, the sexual abuse nurse examiner,
testified that Ana had extensive physical injuries, including multiple bruises, a perforated ear drum,
trauma to the back of the throat, vaginal redness, and marks consistent with a two-prong fork. Gibbs
also testified that Ana's injuries were consistent with her claim that she had been assaulted. Finally,
detectives investigating Ana's home found a window with the screen removed, a broken cell phone,
a meat fork, and knives, just as Ana had described them.

 Because error in the admission of evidence is non-constitutional, Campbell must
show that the error affected his substantial rights. Tex. R. App. P. 44.2(b). A substantial right is
affected when the error has a substantial and injurious effect or influence in determining the jury's
verdict. Rich v. State, 160 S.W.3d 575, 577 (Tex. Crim. App. 2005). Substantial rights are not affected
by the erroneous admission of evidence if, after examining the record as a whole, we have fair
assurance that the error did not influence the jury, or had but slight effect. Motilla v. State, 78 S.W.3d
352, 355 (Tex. Crim. App. 2002). In making this determination, we consider whether the State
emphasized the error, whether the erroneously admitted evidence was cumulative, and whether it was
elicited from an expert. Id. at 356.

 In this case, the testimony concerning the Facebook messages was not elicited from
an expert. In addition, aside from impeaching Campbell with the messages at trial, the State did not
otherwise emphasize the messages, including during its closing argument. Finally, upon review of
the record, we conclude that the messages were cumulative of other evidence. At trial, Campbell
testified as follows:

 

 STATE: How did she hit you in your face? With her first or her open hand?


 CAMPBELL: Yes, she open hand she keep going like that. And I said, stop,
Ana, stop. It was like a joke until it get serious.


 STATE: Did it hurt?


 CAMPBELL: Yes, it hurt, of course. But, you know, I'm a man, I don't
really was, you know, going to hit her back, you know.

 And then she start to slap me. She start to slap me. And I
said, Ana, stop. If you don't stop I'm going to hit you back
and you ain't going to like it because my one going to be
harder than your own. That's what I told her, you know.


 STATE: Did she eventually stop hitting you?


 CAMPBELL: She never stop hitting me. She just take it as like a joke thing,
but she were hitting me hard.


 STATE: After you told her to stop, then what happened?


 CAMPBELL: Then I hit her back.


 STATE: How did you hit her?


 CAMPBELL: I hit her with my hand.


 STATE: Where did you hit her?


 CAMPBELL: In her face right here.


Thus, Campbell's own testimony was that he struck Ana. This testimony is entirely consistent with
the statement in the Facebook message that Campbell claims was so crucial to the jury's verdict--"it
don't matter what you say or do to me i should never put my hand on you."

 In light of the cumulative evidence in the record demonstrating that Campbell struck
Ana, we conclude that any error in admitting the evidence did not have a substantial and injurious
effect on the jury's verdict and should be disregarded. Campbell's sole point of error is overruled.

CONCLUSION


 Because the trial court did not abuse its discretion in admitting the Facebook messages,
we affirm the trial court's judgment.



 __________________________________________

 Diane M. Henson, Justice

Before Justices Puryear, Henson and Goodwin

Affirmed

Filed August 31, 2012

Publish
1. We refer to complainant by her first name in order to protect her identity.
2. Campbell was also charged with another count of aggravated assault with a knife as deadly
a weapon, but the jury found him "not guilty" of this count. See Tex. Penal Code Ann. § 22.022
(West 2011).
3. For example, Campbell testified at trial, "I took the knife, but I never pointed to [Ana]. I
take up the knife out of her way, her reach, and tell her that, this, you cannot play with knife because
knife will give you a cut. That's why I take it. That's the thing that I told the detective."